# In the United States Court of Federal Claims

**FOR PUBLICATION**

No. 24-1120C

(Filed: September 10, 2024[*])

|  |  |
|---|---|
| **ASSOCIATED ENERGY GROUP, LLC (d/b/a AEG FUELS)**, | ) ) ) ) |
| *Plaintiff*, | ) ) ) |
| v. | ) ) ) |
| **UNITED STATES**, | ) ) ) |
| *Defendant*. | ) ) ) |

*Todd J. Canni*, Baker & Hostetler LLP, Los Angeles, CA, for plaintiff. With him on the briefs were *Kevin T. Barnett*, *Stephen E. Ruscus*, *Kevin N. Dorn*, and *Kaitlyn E. Toth*, Baker & Hostetler LLP, Washington, DC.

*Eric E. Laufgraben*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, for defendant. With him on the briefs were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, and *Patricia M. McCarthy*, Director, and *Douglas K. Mickle*, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC. *Alex M. Mayfield*, Senior Counsel, U.S. Department of Defense, Defense Logistics Agency Energy, *Of Counsel*.

**OPINION AND ORDER**

**BONILLA, Judge**.

Before the Court is plaintiff Associated Energy Group, LLC's (AEG) fifth bid protest concerning a sequence of contracts managed by the United States Department of Defense, Defense Logistics Agency Energy (DLA Energy) to deliver

---

[*] This opinion was originally filed under seal on September 6, 2024, in accordance with the protective order entered in this case. The Court invited counsel to review the decision for any proprietary, confidential, or other protected information and propose redactions. On September 10, 2024, counsel jointly informed the Court that no redactions were necessary and requested immediate publication.

automotive, diesel, and jet fuel to a United States military base and nearby airfield located in the Republic of Djibouti. This pre-award bid protest challenges the foreign licensing and pricing requirements included in the agency's resolicitation of a three-year, firm fixed-price fuel supply contract worth over $500 million. The Court previously determined AEG lacked Article III and Tucker Act standing to challenge DLA Energy's award (and extension) of a sole source bridge contract during the pendency of the corrective action taken in response to the initial bid protest. Here, the Court concludes AEG clears the standing hurdles to contest the terms of the resolicitation pre-award but falls short on the merits. Accordingly, plaintiff's motion for a preliminary injunction is DENIED and defendant's cross-motion to dismiss is DENIED.

## BACKGROUND

Strategically located in the Horn of Africa, Djibouti lies east of Ethiopia, northwest of Somalia, and south of Eritrea. The country's eastern shores run into the Gulf of Aden and the Red Sea. Under French rule for over eighty years, the former French Somaliland (a/k/a French Territory of the Afars and Issas) gained its independence in 1977. Since that time, the United States has maintained enhanced diplomatic relations–elevating its consular representation dating back to 1929 to an American Embassy–and provided significant "bilateral assistance for humanitarian programs, military training and border security."[1]

At the turn of the century, the United States' military presence in East Africa was neither an inevitable nor forgone conclusion. In response to the September 11, 2001 attacks, the United States stood up the Combined Joint Task Force–Horn of Africa (CJTF-HOA) as part of Operation Enduring Freedom to conduct strategic stabilization efforts in the region, including the Bab-el-Mandeb Strait, one of the busiest shipping routes in the world and a window into the Middle East.[2] In 2003, the CJTF-HOA arrived at Camp Lemonnier–after the American and Djiboutian governments entered into an agreement to lease the base–which now serves as the only permanent American military base in Africa. Operational management transitioned to the United States Navy three years later, where it remains today.[3] Chabelley Airfield, established in March 2013 and managed by the United States

---

[1] *See* https://perma.cc/9DGR-UE4K (U.S. Department of State archived website: Djibouti) (last visited Sept. 5, 2024); https://perma.cc/DL3F-R8BD (U.S. Department of State website: Djibouti) (last visited Sept. 5, 2024).

[2] *See* Joseph Clark, *Pentagon Policy Official Underscores Defense Ties With Djibouti*, U.S. DEP'T OF DEFENSE NEWS (Aug. 21, 2023), publicly available at https://perma.cc/9Y52-PAHJ (last visited Sept. 5, 2024); U.S. NAVY REGION EUROPE, AFRICA, CENTRAL (EURAFCENT) (History of Camp Lemonnier, Djibouti), publicly available at https://perma.cc/G4HV-RPZR (last visited Sept. 5, 2024).

[3] *See* Eric Schmitt, *U.S. Signs New Lease to Keep Strategic Military Installation in the Horn of Africa*, N.Y. TIMES (May 5, 2014); Lt. J.G. Brittany Crocker, *U.S. Navy Capt. Eilis Cancel Assumes Command of Camp Lemmonier, Djibouti* (Apr. 16, 2024), publicly available at https://perma.cc/9X7B-KKAZ (last visited Sept. 5, 2024).

Air Force, lies nearly twelve miles southwest of Camp Lemonnier.[4]  The United States is not alone in developing a strategic presence in Djibouti: China, a host of European nations, and Saudi Arabia, among other nations, maintain military bases in the country.

Camp Lemonnier and Chabelley Airfield require annual import of millions of gallons of petroleum products (i.e., aviation turbine fuel, automotive gasoline, diesel fuel) to support and maintain the American strategic military operations in the region.  To meet these demands, DLA Energy awards fuel supply contracts broken down into contract line item numbers (CLINs).[5]  Critical here, in 2015, the Djiboutian government adopted new requirements for in-country fuel suppliers and carriers.  On May 12, 2015, Djiboutian President Ismail O. Guelleh, first elected in 1999, decreed: "All companies wishing to import, store, transport, or distribute hydrocarbons and refined hydrocarbons must first obtain an administrative license to conduct such activities from the Ministry of Energy and Natural Resources [(MOE)]."  ECF 24-1 at 95.  Under the new mandate, the MOE was vested with the exclusive authority and discretion to issue, withhold, or revoke fuel transportation licenses–known as Petroleum Activities Licenses (PALs)–based upon the agency's determination of the company's qualifications and compliance with Djiboutian laws and regulations.  Seven months later, on December 10, 2015, President Guelleh declared that the state-owned Société Internationale des Hydrocarbures de Djibouti (SIHD) would henceforth serve as the country's exclusive importer of domestic fuel.  ECF 24-1 at 93.  The MOE was again assigned enforcement responsibilities for the mandate.

From February 2018 to February 2023, United Capital Investments Group, Inc. (UCIG) supplied a range of petroleum products to Camp Lemonnier and Chabelley Airfield under a contract with DLA Energy.  "Founded in 2009 [and] initially focused on the energy sector," according to the firm's website, UCIG currently "invests on behalf of institutional investors across the globe in sectors including Energy, Logistics, Real Estate, and Innovative & Progressive Technologies."[6]  The self-described international boutique investment group is headquartered in Dubai and maintains offices in Brazil, Djibouti, and the United States.

Nine months prior to the expiration of the DLA Energy/UCIG fuel supply contract, on May 26, 2022, DLA Energy issued Solicitation No. SPE605-22-R-0209: a five-year, firm fixed-price contract with roughly twenty-four CLINs to supply

---

[4] *See* Tech. Sgt. Jayson Burns, *Chabelley Airfield celebrates 10-year anniversary*, U.S. AIR FORCES IN EUROPE–AIR FORCES AFRICA (Mar. 28, 2023), publicly available at https://perma.cc/T3SR-3K37 (last visited Sept. 5, 2024).

[5] "[D]ating back to World War II, [DLA] Energy enables mission readiness by providing globally resilient energy solutions to the Warfighter and Whole of Government."  *See* https://perma.cc/QW7A-55C5 (DLA website: About DLA Energy) (last visited Sept. 5, 2024).

[6] *See* https://perma.cc/F8LC-QA9U (UCIG website: Home) (last visited Sept. 5, 2024); https://perma.cc/T4R2-DGP7 (UCIG website: About Us) (last visited Sept. 5, 2024); https://perma.cc/H9WZ-V9X3 (UCIG website: Our Industries) (last visited Sept. 5, 2024).

petroleum products to American assets throughout Africa, including Camp Lemonnier and Chabelley Airfield. The solicitation stated: "Offeror's must possess valid/current operating certificates, permits, or equivalent licenses required to operate in the prescribed jurisdiction. The Djibouti Ministry of Energy is the sole authority that can facilitate the latter stated requirements."[7] AEG submitted an offer to service the two United States military facilities in Djibouti on August 1, 2022, identifying National Oil Ethiopia (NOC) Djibouti and Rubis Energie (Rubis) Djibouti as the company's in-country fuel suppliers. In August 2015, the parent company of NOC Djibouti purchased the assets of OiLibya Djibouti, including an oil depot at the Djibouti International Airport and a fuel fleet of oil tankers for $22 million.[8] Rubis Djibouti, "a subsidiary of the French Rubis Group," similarly began operating in Djibouti in 2015.[9]

On January 26, 2023, DLA Energy awarded AEG CLINs 8, 9, 18, and 19 to supply Camp Lemonnier and Chabelley Airfield with jet fuel, unleaded automotive gasoline, and diesel fuel. The contract was valued at over $450 million. DLA Energy simultaneously awarded Solaris Energy DMCC (Solaris) ten other CLINs under the solicitation valued at $118 million.[10] While UCIG did not submit a proposal in response to the DLA Energy solicitation, the contractor served as the designated fuel supplier for several offerors, including Solaris and unsuccessful bidder Zelawar Enterprise, Inc. (Zelawar).[11]

AEG began contract performance in February 2023. Three weeks later, AEG alerted DLA Energy that the Djiboutian government was "attempting to thwart DLA Energy's award to AEG by ordering NOC Djibouti – AEG's local licensed supplier – not to work with an American company . . . or face 'severe measures.'" ECF 24-1 at 105 (emphasis omitted). AEG further explained: "We are informed that high-ranking officials within the MOE have financial ties to the incumbent contractor [(UCIG)] and apparently are engaging in this inappropriate behavior to force DLA Energy to revert to using the incumbent or one of its affiliates." *Id.* at 106. In a letter to NOC Djibouti–

---

[7] *Associated Energy Grp., LLC v. United States*, No. 23-477 (Fed. Cl.) (ECF 30-1 at 8), *quoted in* ECF 24 at 11, publicly available at https://perma.cc/8B2U-36RT (SAM.gov website: May 26, 2022 Solicitation–Original) (last visited Sept. 5, 2024).

[8] *See National Oil Ethiopia take Oil Libya route to Djibouti*, OIL REVIEW–AFRICA (Aug. 17, 2015), publicly available at https://perma.cc/4ND3-9DS6 (last visited Sept. 5, 2024).

[9] *See* https://perma.cc/W8HW-9QM9 (Rubis Energie website: Company) (last visited Sept. 5, 2024).

[10] According to the firm website: "Founded and based in Dubai, United Arab Emirates, Solaris has grown to be a reputable and reliable company in the energy industry. Solaris operates and has its presence in more than 150 countries across the globe – spreading across the Middle East, Europe, Africa, Asia, [and] North and South America." *See* https://perma.cc/P6NK-JX8F (Solaris website: Home) (last visited Sept. 5, 2024).

[11] "[Zelawar] is a minority and women owned small business that provides fuel and transportation services to U.S. government agencies. The company is registered in SAM.gov as a partnership or limited liability partnership." *See* https://perma.cc/2VLS-8CSJ (last visited Sept. 5, 2024). Since 2019, Zelawar has been awarded nearly $600 million in federal contracts. *Id.*

which prompted AEG's February 22, 2023 notice to DLA Energy–the MOE reportedly accused AEG's in-country fuel supplier with "fraudulently and illegally" operating without the required PAL in delivering petroleum products to Camp Lemonnier on behalf of a foreign company. *See id.* A week later, on March 2, 2023, AEG reported to DLA Energy that MOE officials threatened NOC Djibouti truck drivers, preventing future fuel deliveries, and sought DLA Energy's intervention and a period of excusable delay under the contract.[12] *Id.* at 103.

The next day, Zelawar filed a post-award bid protest in the United States General Accountability Office (GAO). Zelawar specifically challenged DLA Energy's award of CLINs 8 and 18, alleging AEG was "ineligible for award . . . since AEG's subcontractor did not possess and AEG's proposal did not include the required valid and current operating licenses, certificates and permits to supply diesel fuel in Djibouti." ECF 4-1 at 219. Three days later, Solaris protested DLA Energy's award of CLINs 9 and 19 in the GAO, similarly alleging AEG "cannot perform because it is unable to provide/obtain the valid necessary licenses and permit and is unable to obtain access to the necessary storage . . . ." *Id.* at 248. The post-award bid protests filed by Zelawar and Solaris triggered automatic stays on contract performance and the issuance of stop-work orders on all four CLINs awarded to AEG. In late March of 2023, DLA Energy announced it would take corrective action in response to the GAO bid protests and either reevaluate offers or cancel and resolicit the awarded CLINs. *See* ECF 4-1 at 260 (Solaris corrective action), 262 (Zelawar corrective action). GAO dismissed the protests as moot.

DLA Energy immediately reached out to the United States Embassy in Djibouti (U.S. Embassy) to inquire about the African country's petroleum supply licensing requirements. After engaging the Djiboutian Minister of Foreign Affairs and International Cooperation, the Ambassador of the United States to Djibouti (U.S. Ambassador) received the following response from the MOE Minister by diplomatic note dated April 27, 2023:

> **Without a [PAL], companies cannot under any circumstances submit a fuel supply tender**. No exceptions may be made to this rule. No company, even if it is selected at the end of the tender process, will be allowed to supply fuel if it does not first obtain the appropriate license.

ECF 24-1 at 113 (emphasis in original). The U.S. Embassy shared this information with DLA Energy, further confirming "that UCIG was the only in-country supplier with a valid PAL," and that AEG's designated local suppliers–NOC Djibouti and

---

[12] In addition to the DLA Energy Contracting Office, AEG reported these events to DLA Energy's Suspension and Debarment Office on March 16, 2023.

Rubis Djibouti–"did not yet have one but were working toward obtaining them."[13] ECF 24-1 at 127.

The foregoing culminated in AEG's initial bid protest, filed in this Court on April 5, 2023. *See Associated Energy Grp., LLC v. United States*, No. 23-477 (Fed. Cl.) (*AEG I*). AEG challenged DLA Energy's award of CLIN 7 to Solaris (an alleged subsidiary of UCIG), claiming the competitor colluded and engaged in bid rigging with Zelawar to secure the fuel service contract. AEG further asserted that UCIG orchestrated the charged fraudulent conduct. By ostensibly disregarding–rather than discounting–a competitor's documented claims of illegal activity potentially undermining the contract award, AEG argued that the contracting officer's responsibility determination was inherently flawed. AEG also reported its concerns to the United States Department of Justice, Civil Division, Fraud Section and sought a further referral to the Antitrust Division.[14] Then, by letter dated July 30, 2023, AEG shared with DLA Energy allegations that UCIG previously defrauded the agency out of over $200 million through fraudulent price indexing and billing on the 2018 to 2023 Djiboutian fuel supply contract. After a brief stay of proceedings, on November 30, 2023, DLA Energy announced it would take corrective action: terminate the Djiboutian fuel service contract awarded to Solaris and issue a new and broader solicitation to include the CLINs previously awarded to AEG. Notwithstanding AEG's stated objection, the Court dismissed *AEG I* as moot.

Amidst the ongoing bid protests pending in the GAO and this Court, to ensure uninterrupted fuel supply to critical United States military assets in Djibouti, DLA Energy procured a series of sole source spot buys from incumbent contractor UCIG throughout the spring and summer of 2023. Then, on September 1, 2023, the agency awarded a six-month sole-source bridge contract to UCIG, with an additional six-month option running through August 31, 2024. The fixed-price contract was valued at $134 million, or roughly $67 million for each period of performance. AEG protested the sole-source bridge contract award in this Court on December 12, 2023, principally arguing that DLA Energy made a flawed responsibility determination given the serious allegations of collusion, big rigging, and fraudulent overcharging lodged against UCIG. *See Associated Energy Grp., LLC v. United States*, No. 23-2158 (Fed. Cl.) (*AEG II*). AEG also challenged the sole-source nature of the award and its length of performance.

AEG's intervening efforts to secure a PAL for the company's in-country suppliers (i.e., NOC Djibouti and Rubis Djibouti) or in its own name were reportedly

---

[13] DLA Energy formally terminated the contract for convenience on January 11, 2024, following the agency's "verifi[cation] that AEG did not hold or provide the [PAL] and is therefore unable to provide the required fuel support to the military camps in Djibouti." ECF 4-1 at 438.

[14] Although the Court and parties are generally aware that DLA Energy, the U.S. State Department, the U.S. Embassy, and the U.S. Department of Justice have looked into AEG's allegations of fraud and foreign corruption, save the information included herein, neither the undersigned nor counsel for the parties have been briefed on the nature and extent of any ongoing diplomatic efforts or investigation.

rebuffed and ultimately denied by the MOE Director of Hydrocarbons. According to AEG, when the company informally raised the topic in mid-May 2023, the MOE official reportedly "expected a payment under the table to help AEG do business in Djibouti." ECF 4-1 at 12 (emphasis omitted); *accord id.* at 13–14. The MOE official alternatively suggested that AEG use duly licensed UCIG as its in-country supplier rather than NOC Djibouti or Rubis Djibouti. *Id.* at 13. Five months later, AEG formally sought a PAL in its own name. The MOE Director denied AEG's application, explaining that the three current in-country fuel suppliers (i.e., UCIG, NOC Djibouti, Rubis Djibouti) sufficiently covered the "relatively low fuel consumption" in Djibouti. *Id.* at 357.

While *AEG II* was proceeding, DLA Energy initiated the corrective action announced in response to *AEG I* and the GAO protests filed by Zelawar and Solaris. On January 5, 2024, the agency issued Request for Information (RFI) No. SPE605-24-RFI-1006 for the resolicitation of the fuel supply contact in Djibouti. The eligibility criteria outlined by DLA Energy included three licenses to conduct business in Djibouti: (1) a Patent License issued by the Ministry of Economy, Finance, and Planning (a/k/a Ministry of Budget or MOB); (2) a Commercial License issued by the MOB; and (3) the PAL issued by the MOE. Nine companies responded to the RFI, including AEG, NOC Djibouti, Rubis Djibouti, and UCIG. Only UCIG possessed all three active licenses. NOC Djibouti represented to DLA Energy that the fuel supplier "possesses valid and current" patent and commercial licenses and that its PAL "is under the process for renewal" but that "the [MOE] has assured us that we will have the renewed license by the time of the solicitation." ECF 24-1 at 115. Rubis Djibouti, in turn, similarly represented that the company possessed active patent and commercial licenses, but that it was "in litigation" with the MOE regarding the disputed "double authorization to operate in Djibouti and double payment." *Id.* at 118.

On January 21, 2024, the U.S. State Department received a diplomatic cable from the U.S. Embassy. In sum and substance, the three-page document (redacted) relayed communications between the U.S. Embassy and Djiboutian government officials relating to "Djibouti: [MOE] on Transition to Renewables, Long-Running Military Fuel Supply Issue." ECF 4-1 at 2. Addressing the restrictions placed on NOC Djibouti and Rubis Djibouti, the diplomatic cable related:

> [A Djiboutian government official] said the reason a U.S. fuel company has been unable to subcontract with several local fuel distributors to supply Camp Lemonnier (CLDJ) is because the companies are in long-term arrears with the [MOE] and prevented from taking on any new contracts or expanding their businesses.

*Id.* The MOE reported that the two in-country fuel suppliers had "long-standing licensing problems . . . going back at least to 2016." *See id.* at 3. According to the MOE, despite sending annual notices to NOC Djibouti and Rubis Djibouti to

7

"regularize their status," the agency had not "stopped existing operations or contracts, choosing to . . . [instead stop] expansion plans or new contracts . . . in the interest of not entirely disrupting the Djiboutian market." *Id.* The cable ended with a note of particular importance in the present case:

> The [MOE] Minister, along with his technical advisor for hydrocarbons, noted that *the Ministry had no intention of interfering with the provision of fuel to [Camp Lemonnier]*, but also questioned why a non-Djiboutian company was able to win the contract, given that all fuel for consumption in Djibouti is imported by the parastatal [SIHD].

*Id.* (emphasis added).

On February 29, 2024, immediately following oral argument on the parties' dispositive cross-motions in *AEG II*, the Court issued a bench ruling holding that AEG lacked both Article III standing under the United States Constitution, U.S. CONST. ART. III, and statutory standing under the Tucker Act, 28 U.S.C. § 1491, to challenge the sole-source bridge contract awarded to UCIG. As explained, the Court does not possess the authority to require the Djiboutian government to issue a PAL to AEG (or the company's designated in-country fuel suppliers) or order a sovereign nation to waive enforcement of its own licensing requirements. Nor can the Court order DLA Energy to ignore foreign licensing laws and requirements in awarding a contract to be performed on foreign soil in hopes that the sovereign nation might waive enforcement or otherwise excuse noncompliance. In other words, the alleged foreign corruption AEG sought to root out through domestic injunctive relief is beyond the statutorily limited authority of this Court. Immediately following the dismissal of *AEG II*, DLA Energy exercised the option to extend UCIG's bridge contract through August 31, 2024, with fuel deliveries on pre-orders continuing through September 6, 2024. As of the publication of this opinion, AEG's appeal of the standing decision to the United States Court of Appeals for the Federal Circuit remains pending.[15]

After the dismissal of *AEG II*, AEG filed a third bid protest on March 27, 2024, challenging the noticed scope of DLA Energy's impending resolicitation of the initial fuel supply contract. *See Associated Energy Grp., LLC v. United States*, No. 24-470 (Fed. Cl.) (*AEG III*). AEG voluntarily dismissed *AEG III* shortly after DLA Energy published Request for Proposal (RFP) No. SPE605-24-R-0205, ultimately setting a closing date of May 7, 2024. The three-year competitive resolicitation seeks to procure a range of fuel products throughout Africa, including for Camp Lemonnier and Chabelley Airfield. As with the previously challenged solicitations, the technical capability requirements include a licensure requirement:

---

[15] The Federal Circuit appeal is fully briefed with oral argument scheduled for October 10, 2024.

> To be technically acceptable under this subfactor, the offeror must submit a statement that the offeror, by itself and/or through its subcontractors, currently has all permissions, certifications, qualifications, licenses, and commitments required to deliver the offered product.

ECF 24-1 at 34. The solicitation then lists the MOB-issued Patent License and the MOE-issued PAL as required licenses. In lieu of the previously specified MOB-issued Commercial License, the procurement requires a "supply commitment letter from S.I.H.D." *Id.* at 35. The solicitation also includes an Economic Price Adjustment (Overseas) provision, accounting for price adjustments due to market fluctuations based on the local SIHD and Platts indexes.[16]

AEG filed a pre-award bid protest in the GAO on May 6, 2024, challenging the technical requirements that offerors have a valid PAL and SIHD commitment letter. *See Associated Energy Grp., LLC*, File No. B-422564 (GAO) (*AEG IV*). Citing the January 21, 2024 diplomatic cable, quoted *supra*, AEG primarily argued that the licensing requirements were unnecessary and, thus, unreasonable since the MOE assured the U.S. Embassy that "the Ministry had no intention of interfering with the provision of fuel to [Camp Lemonnier]." AEG withdrew the matter after the GAO signaled its intent to dismiss portions of the protest. Of note, while *AEG IV* was pending before the GAO, officials within the U.S. Embassy reportedly met with the MOE Secretary General/Minister. As relayed to the DLA Energy Contracting Office, the MOE top official purportedly confirmed during that May 23, 2024 diplomatic meeting that the Djiboutian government's intended to continue enforcing the fuel transport licensing requirements, including the PAL.

AEG filed the current pre-award bid protest in this Court on July 23, 2024, challenging the RFP's inclusion of the Djiboutian licensing and supply commitment letter requirements, as well as a cost adjustment scheme based on the SIHD Index. *See Associated Energy Grp., LLC v. United States*, No. 24-1120 (Fed. Cl.) (*AEG V*). The effect of the technical requirements, according to AEG, produces a de facto sole source procurement since UCIG is the sole active PAL holder; and, without a PAL, the SIHD will not issue a supply commitment letter. AEG contests the Economic Price Adjustment provision's reliance on the SIHD Index, alleging that the mandatory inclusion of above-market contract pricing would force American contractors to defraud DLA Energy by systematically charging above-market fuel rates. AEG seeks an order of this Court directing DLA Energy to strike the PAL and SIHD supply commitment letter from the solicitation's technical factors as well as the mandated use of the SIHD Index found in the Economic Price Adjustment provision.

---

[16] The SIHD Index is a reference point for diesel and jet fuel in Djibouti, while the Platt's Index serves as a reference for in-country automotive gasoline.

In response to AEG's motion for a preliminary injunction, as in *AEG II*, defendant first challenges the company's Article III and Tucker Act standing under Rules 12(b)(1) and 12(b)(6) of the Rules of the Court of Federal Claims (RCFC), respectively.[17] Specifically, defendant asserts AEG cannot contest the provisions of an international solicitation because it is ineligible to receive the award as neither the firm nor its designated suppliers possess the necessary local fuel transportation license and supply commitment letter. On the merits, defendant avers the contested foreign licensing and pricing requirements are not arbitrary, capricious, an abuse of discretion, or otherwise contrary to law. Defendant argues that AEG's expectation to deliver petroleum products in Djibouti without the required in-country PAL and SIHD supply commitment letter–and consequent demand that DLA Energy assume that risk–is speculative and compromises the uninterrupted operation of military and national security assets. Finally, defendant maintains that AEG misinterprets DLA Energy's reliance upon the SIHD Index as an adopted price model rather than a simple reference point.

## DISCUSSION

### I. Motion to Dismiss

#### A. Legal Standards

To establish Article III (constitutional) standing, AEG must show it suffered "an actual or imminent injury-in-fact that is concrete and particularized," caused by DLA Energy, and capable of favorable redress in this Court. *See Starr Int'l Co. v. United States*, 856 F.3d 953, 964 (Fed. Cir. 2017) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). Stated differently, "[i]f 'the plaintiff does not claim to have suffered an injury that the defendant caused and the court can remedy, there is no case or controversy for the federal court to resolve.'" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citation omitted). For Tucker Act (statutory) standing, AEG must demonstrate it is an "interested party"; that is, an actual or prospective bidder with a "direct economic interest" in the procurement or proposed procurement. *CACI, Inc.-Federal v. United States*, 67 F.4th 1145, 1151 (Fed. Cir. 2023) (quoting *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006)). The requisite economic interest requires AEG to demonstrate "it had a 'substantial chance' of winning the contract.'" *Id.* (quoting *Digitalis Educ. Sols., Inc. v. United States*, 664 F.3d 1380, 1384 (Fed. Cir. 2012)). As recently made clear, constitutional standing is jurisdictional, implicating dismissal under RCFC 12(b)(1) or 12(h)(3), whereas statutory standing is not and, thus, addressable through a dispositive motion filed early in the proceedings under RCFC 12(b)(6) or in the course of adjudicating the merits thereafter. *See CACI*, 67 F.4th at 1152.

---

[17] In light of the ruling in *AEG II*, the Court directed the parties to address the issue of standing.

When the Court's authority to entertain a cause of action is challenged or otherwise called into question under RCFC 12(b)(1), the plaintiff must present preponderant evidence that jurisdiction is proper. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988). In evaluating the jurisdictional propriety of a claim, "the court [is] obligated to assume all factual allegations to be true and to draw all reasonable inferences in plaintiff's favor." *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995) (first citing *Scheuer v. Rhodes*, 416 U.S. 232, 236–37 (1974); and then citing *Catawba Indian Tribe of S.C. v. United States*, 982 F.2d 1564, 1568–69 (Fed. Cir. 1993)). Dispositive motions filed under RCFC 12(b)(6) similarly require courts to "accept as true all the factual allegations in the complaint . . . [and] indulge all reasonable inferences in favor of the non-movant." *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001) (internal citations omitted). "A trial court should not dismiss a complaint for failure to state a claim unless it is 'beyond doubt that the plaintiff can prove no set of facts which would entitle him to relief.'" *Id.* (quoting *Hamlet v. United States*, 873 F.2d 1414, 1416 (Fed. Cir. 1989)). In performing these assessments, however, asserted legal conclusions are not credited, and the complaint must sufficiently plead factual allegations setting forth a plausible–as opposed to merely conceivable–claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)).

### B. Standing

AEG has Article III standing to challenge this solicitation at the pre-award stage. AEG identified a clear and concrete injury, caused by DLA Energy, that is redressable in this Court: the ability to contest specific terms of the solicitation. These terms establish the contract eligibility criteria currently rendering AEG incapable of realistically competing for the Djiboutian fuel supply contract. The technical factors included in the contested solicitation require that prospective bidders possess a current MOE-issued PAL and SIHD-issued supply commitment letter, and the solicitation's Economic Price Adjustment provision requires the use of the SIHD Index in developing cost proposals. AEG and the company's designated in-country fuel supplies concededly lack the fuel transport license and supply commitment letter specified; once more, AEG represents it cannot lawfully rely upon the cited fuel pricing index. As such, any technical and cost proposals submitted by AEG under the current solicitation likely would be summarily rejected by DLA Energy as technically unacceptable or otherwise non-responsive to the solicitation.

With the presumed contract award date approaching, AEG's window of opportunity to contest the solicitation requirements is closing fast and threatens imminent consequences. Indeed, absent judicial intervention, DLA Energy intends to award the three-year fuel supply contract under the current solicitation rather than make additional spot buys or award another bridge contract. As the contracting agency and the author of the contested solicitation, there is a direct causal link between DLA Energy's actions and AEG's claimed injury. Finally, the ability to redress improper solicitation terms is clearly within this Court's authority at the

pre-award stage. *See Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1315 (Fed. Cir. 2007) ("[A] party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection afterwards in a § 1491(b) action in the Court of Federal Claims."). For these reasons, and without regard to the relative merit of underlying challenges addressed *infra*, AEG has constitutional standing to contest the solicitation terms at this preliminary (pre-award) procurement stage.

AEG similarly has Tucker Act standing to challenge the disputed solicitation terms at this pre-award stage. AEG is an actual and prospective bidder with the requisite direct economic interest in the impending DLA Energy fuel supply contract. The company has a documented history of winning a predecessor contract for the same products and services, delivered to the same United States military base and airfield in Djibouti, awarded by DLA Energy. Indeed, this resolicitation is for the same CLINs AEG originally won less than two years ago in the preceding solicitation (No. SPE605-22-R-0209). Aside from the now-contested terms, neither party has pointed out any material differences between the solicitations. With respect to the PAL and supply commitment letter, in particular, the original and current solicitations include the same general licensing and permit requirement. The difference lies in the current iteration of the solicitation specifically identifying the PAL and supply commitment letter resulting from AEG's previously aborted performance.

Over the course of the last two years, moreover, AEG has consistently and actively engaged in the DLA Energy procurement to supply petroleum products to United States military assets in Djibouti. At every stage, AEG vigorously pursued the award of certain CLINs, including those serving Camp Lemonnier and Chabelley Airfield. The company's contemporaneous and continuing supply of fuel products to non-United States military assets in Djibouti through NOC Djibouti and Rubis Djibouti underscores AEG's ability to meet the remaining contract requirements.

These facts–particularly AEG's prior success at winning the predecessor solicitation and ongoing similar performance in the region–demonstrate plaintiff has a "substantial chance" of securing the award *without the disputed licensing and price provisions*. *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) ("To establish prejudice, [plaintiff] must show that there was a 'substantial chance' it would have received the contract award *but for the alleged error in the procurement process*.") (emphasis added) (citing *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999)); *see also Am. Fed'n of Gov't Emps., Local 482 v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001); *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1334 (Fed. Cir. 2001). As reasoned in *Information Technology*: "Under these circumstances, [plaintiff] has established prejudice (and therefore [Tucker Act] standing), because it

had greater than an insubstantial chance of securing the contract *if successful on the merits of the bid protest*." 316 F.3d at 1319 (emphasis added).

The Court distinguishes this ruling from *AEG II*, wherein AEG's post-award protest was dismissed for lack of Article III and Tucker Act standing. There, AEG did not protest specific terms of the solicitation pre-award,[18] but rather, the non-competitive nature of the sole source bridge contract post-award, as well as DLA Energy's responsibility determination for UCIG. In contrast to the requisite showing of standing to challenge the *proposed* rules of engagement in a pre-award protest, stated above, to launch a viable post-award challenge to the application of *established* rules post-award, a plaintiff must show it would have had a substantial chance of winning the award in a competitive process under the now incontrovertible rules of engagement. This requirement applies equally to establish Article III and Tucker Act standing in a post-award bid protest. *See Innovation Dev. Enters. of Am., Inc. v. United States*, 108 Fed. Cl. 711, 724 (2013) ("It is true that the protestor of a sole-source procurement must show that it had a substantial chance of contract award *but for the agency's decision to limit competition for the contract*.") (emphasis added) (citing *Info. Tech.*, 316 F.3d at 1319; *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1086 (Fed. Cir. 2001)). But DLA Energy awarded (and thereafter extended) the September 1, 2023 bridge contract to UCIG in large part because it was the only fuel supplier with a valid PAL. Without this specific fuel transport license–the cited cause for AEG's discontinued performance under the then-legacy contract–AEG did not have a "substantial chance of contract award." In fact, AEG had *no* chance of winning the bridge contract and, thus, lacked standing to challenge it post-award.

As AEG correctly posits, it would be inappropriate for the Court to presume or otherwise speculate about future performance roadblocks in deciding this threshold issue in the pre-award context. Rather, in assessing AEG's standing to challenge the solicitation, the focus must remain on the contractor's likelihood of winning the award *in the absence of the contested terms*. The legality and reasonableness of the local licensing and pricing requirements–including the likelihood that the Djiboutian government will again enforce the MOE-issued PAL and SIHD-issued supply commitment letter mandates–go to the merits of AEG's challenges to the solicitation as opposed to AEG's standing to raise them. To find otherwise would require a prophetic analysis of a contractor's eventual success on the merits to determine whether they had standing to bring the claim in the first instance. The cart must not pull the horse. Accordingly, defendant's motion to dismiss for lack of Article III and Tucker Act standing is denied.

---

[18] Given the nature and timing of the sole-source bridge contract awarded to UCIG, AEG was reportedly (and presumably) unaware of the procurement in time to file a pre-award protest.

13

## II. Motion for Injunctive Relief

### A. Legal Standard

In certain circumstances, including pre-award bid protests, this Court is authorized by statute to award "any relief that the court considers proper, including declaratory and injunctive relief . . . ." 28 U.S.C. § 1491(b)(2). "The purpose of a preliminary injunction in a bid protest is to preserve the *status quo* pending resolution of the case on the merits." *SEKRI, Inc. v. United States*, No. 21-778, 2023 WL 1428644, at *2 (Fed. Cl. Jan. 31, 2023) (citing *Cont'l Serv. Grp., Inc. v. United States*, 722 F. App'x 986, 994 (Fed. Cir. 2018)). That said, "[a] preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc. v. United States*, 555 U.S. 7, 24 (2008) (citation omitted).

To prevail, a plaintiff must show by preponderant evidence: (1) a likelihood of success on the merits, (2) irreparable harm without relief, (3) the balance of hardships favors relief, and (4) relief supports the public interest. *See PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004) (citing *Amoco Prod. Co. v. Vill. of Gambell,* 480 U.S. 531, 546 n.12 (1987)). Although no single factor is dispositive, an injunction will not be granted absent a showing of likelihood of success and irreparable harm. *SEKRI*, 2023 WL 1428644, at *2 (citing *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001)) (additional citations omitted); *see also Polymer Tech., Inc. v. Bridwell*, 103 F.3d 970, 973–74 (Fed. Cir. 1996) ("[A] trial court need not make findings concerning the third and fourth factors [of a preliminary injunction] if the moving party fails to establish either of the first two factors.") (citation omitted). Otherwise, "the weakness of . . . one factor may be overborne by the strength of the others." *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993).

### B. Preliminary Injunction

AEG seeks to enjoin DLA Energy's inclusion of the disputed technical requirements of the solicitation as well as the agency's reliance on the SIHD Index in the Economic Price Adjustment provision. In support, AEG charges that securing the MOE-issued PAL requires an "under-the-table payment" to a Djiboutian government official in violation of the laws of the United States (i.e., Foreign Corrupt Practices Act of 1977, 15 U.S.C. § 78dd-1, *et seq.*, Foreign Extortion Prevention Act of 2023, 18 U.S.C. § 201). Because the issuance of the SIHD supply commitment letter is contingent upon having a valid PAL, AEG maintains that the corrupt demand taints this requirement by extension. AEG further claims that the MOE's reported representation to the U.S. Embassy, as memorialized in the U.S. State Department Cable–i.e., "that the Ministry had no intention of interfering with the provision of fuel to [Camp Lemonnier]," ECF 4-1 at 3–signals that the Djiboutian government will no longer enforce the PAL requirement. Based on this interpretation of the cable, AEG maintains that the PAL requirement in the solicitation unduly limits competition by excluding otherwise qualified suppliers like AEG. To this end, plaintiff represents

that its in-country suppliers (i.e., NOC Djibouti and Rubis Djibouti) continue to deliver petroleum products for non-United States interests throughout the region without the MOE-issued PAL or, presumably, the SIHD supply commitment letter.

Turning to the required use of the SIHD Index under the Economic Price Adjustment provision, AEG asserts that the mandated inclusion of above-market fuel pricing in generating cost proposals axiomatically will result in submitting inflated invoices to DLA Energy throughout the course of the three-year contract. AEG represents that, as current in-country suppliers, NOC Djibouti and Rubis Djibouti are on the distribution list of the regularly updated SIHD fuel prices which are below the SIHD Index cited in the solicitation. Inflated pricing is the exact fraudulent scheme AEG alleged against UCIG in *AEG II*. Upon this premise, AEG believes its complicity with the Economic Price Adjustment provision will expose the company to criminal fraud charges and civil enforcement measures, including debarment.

### 1. *Likelihood of Success*

While AEG's allegations of public corruption and fraudulent activities by Djiboutian government officials and the company's competitors are alarming, they are not matters this Court is authorized to investigate, prosecute, adjudicate, resolve, or sanction. Those issues properly fall within the jurisdictional providences of diplomats, law enforcement, criminal courts, the United States military, the United States Congress, and the President of the United States. Nor would it be appropriate for this Court to enjoin the award of the Djiboutian fuel supply contract to encourage other branches of government to engage with Djiboutian government officials or provoke the reexamination, withdrawal, or abandonment of United States military assets in Africa. Rather, this Court's inquiry is limited to whether DLA Energy's inclusion of the contested terms of the solicitation are arbitrary, capricious, an abuse of discretion, or contrary to law. In performing this assessment, AEG, as the moving party, neither benefits from the presumption its factual allegations are true, nor an adoption of inferences drawn in its favor. Based upon the record presented, the Court finds AEG has not presented preponderant evidence showing it is likely to succeed on the merits of this pre-award bid protest. In fact, the opposite is true.

As an initial matter, as made clear throughout this series of pre- and post-award bid protests: this Court is not vested with the statutory authority or inherent power to require the Djiboutian government to issue a PAL to AEG (or the company's designated in-country fuel suppliers) or order a sovereign nation to waive enforcement of its own licensing requirements. Nor, critical here, can the Court reasonably compel DLA Energy to ignore foreign licensing laws and requirements in awarding a contract to be performed on foreign soil in hopes that the sovereign nation might waive enforcement or otherwise excuse noncompliance. This is particularly true in this case given that AEG's performance under a predecessor contract was halted and discontinued precisely because the company's in-country suppliers lacked valid PALs.

On their face, the licensing requirements included in technical subfactors 2(c) and (d) are reasonable. Subfactor 2(c), titled "Licensure," mandates that offerors or their subcontractors "currently ha[ve] all permissions, certifications, qualifications, licenses, and commitments required to deliver the product required under [the] solicitation line items . . . ." ECF 24-1 at 34–35. Subfactor 2(d), titled "Djibouti Licensure and Supply Commitment Letter," in turn, specifically requires offerors to produce copies of an SIHD-issued supply commitment letter, an MOB-issued Patent License, and an MOE-issued PAL. *Id.* at 35. Moreover, as explained *supra*, the contested licensing and fuel supply commitment requirements date back to the Djiboutian President's 2015 proclamations. The Djiboutian government's licensing requirement to transport explosive, hazardous, and toxic chemicals on its sovereign soil–posing significant public health and safety, economic, environmental, and national security concerns–is inherently reasonable. So too is DLA Energy's inclusion of the foreign licensing requirement in the solicitation. The reasonableness of the solicitation's requirement that offerors possess and present the supply commitment letter lies in the fact that the SIHD is the exclusive state-approved fuel importer in Djibouti. Without a firm commitment from SIHD, there will be no fuel to deliver.

Notwithstanding the clear practical implications of requiring contractors to abide by the laws and regulatory requirements of the sovereign nation where performance will take place, the history of this bid protest underscores the need for the PAL as well as the SIHD supply commitment letter. In February 2023, MOE officials blocked AEG's in-country supplier from delivering petroleum products to Camp Lemonnier because NOC Djibouti lacked a valid PAL. Two months later, by diplomatic note dated April 27, 2023, MOE confirmed to the U.S. Ambassador that SIHD is Djibouti's exclusive fuel importer and, further, "No company . . . will be allowed to supply fuel if it does not first obtain the [PAL]." ECF 24-1 at 113. As if the PAL language was not already clear, the MOE added: "No exceptions may be made to this rule." *Id.* The MOE's contemporaneous suggestion to AEG that the company consider partnering with licensed supplier UCIG, rather than its current (unlicensed) in-country fuel suppliers, conforms with the official message. A year later, in May 2024, the MOE reportedly "re-confirmed" to the U.S. Ambassador "that a PAL remains a requirement in Djibouti." *Id.* at 127.

AEG's reliance upon the singular and vague representation included in the January 21, 2024 U.S. State Department diplomatic cable is overplayed. Indeed, the MOE Minister's reported representation that "the Ministry had no intention of interfering with the provision of fuel to [Camp Lemonnier]," ECF 4-1 at 3, is susceptible to several interpretations. AEG's contention that the cited assurance was meant to proclaim that the MOE would no longer enforce the PAL requirement is belied by the narrowness of the statement and the record presented. As an initial matter, although not dispositive, the reported statement uses the past tense form of the verb "had" rather than the present and future tense "has" in describing the foreign government officials' intentions regarding the fuel supply to Camp Lemonnier. Taken to its logical conclusion, the January 21, 2024 statement can be read as an

16

apology for the *past* service disruption to the United States military base as opposed to an open-ended commitment to allow the free flow of fuel by unlicensed suppliers to all United States assets. Indeed, the statement makes no representations regarding Chabelley Airfield. And, unlike the surrounding pointed representations regarding MOE's intended continued enforcement of the PAL requirement, the relied upon January 21, 2024 note makes no specific reference to the contested licensing requirement. The Court must review the cable as a whole, rather than its parts, and critically, AEG's interpretation of this isolated and vague sentence ignores certain context.

Further, as noted above, five months *after* the touted January 21, 2024 U.S. State Department diplomatic cable, the MOE reaffirmed to the U.S. Ambassador the continuing need for a valid PAL to transport fuel in Djibouti. AEG's current claims of selective enforcement of the PAL requirement are, in fact, consistent with the MOE's restated position. As explained in the January 21, 2024 diplomatic cable, NOC Djibouti's and Rubis Djibouti's inability to secure a current PAL lies in their reported long-term arrearages and licensing problems with the MOE, and the Ministry's election to leverage reconciliation through targeted enforcement on "expansion plans or new contracts" rather than "disrupt[] the Djiboutian market . . . [by] stopp[ing] existing operations or contracts . . . ." *Id.* It is not unreasonable for DLA Energy to account for the MOE's stated intent to enforce the PAL requirement on new fuel supply contracts.

At bottom, the sentence included in the January 21, 2024 diplomatic cable is not the raison d'être AEG purports it to be. In context, the excerpt reads more like a reactionary denial or apology to a pointed question by the U.S. Ambassador asking why (or whether) MOE officials were interfering with the supply of fuel to in-country United States military assets. That said, the Court's musings regarding potential interpretations need not be conclusively resolved herein. It is sufficient to find, as the Court does, that DLA Energy's calculus in including the PAL and SIHD supply commitment letter requirements in the solicitation to avoid a repeat of the blocked contract performance was not arbitrary, capricious, an abuse of discretion, or contrary to law.

Moving to the Economic Price Adjustment provision, the Court again finds that AEG's claim has no likelihood of success on the merits. In its complaint, AEG alleges two counts related to the pricing provision: (1) DLA Energy's inclusion of the SIHD Index will result in forcing the United States to pay higher fuel prices than other nations and entities operating military bases and other assets in Djibouti, and (2) the federal agency's reliance on the Djiboutian index effectively converts this solicitation into a sole source procurement for UCIG. These claims resemble the price gouging scheme AEG accused UCIG of engaging in during the predecessor 2018 to 2023 Djiboutian fuel supply contract raised in *AEG II*.

17

In support of AEG's current claims that the Economic Price Adjustment provision is contrary to law and, therefore, should be excised from the solicitation, plaintiff cites Federal Acquisition Regulation (FAR) 52.203-13. Titled "Contractor Code of Business Ethics and Conduct," Section (b)(2) provides: "The Contractor shall– (i) Exercise due diligence to prevent and detect criminal conduct; and (ii) Otherwise promote an organizational culture that encourages ethical conduct and a commitment to compliance with the law." FAR 52.203-13(b)(2). AEG further points to Subsection (b)(3)(i), which mandates the timely self-disclosure of a contractor's or one of its agent's criminal acts, including: "(A) A violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code; or (B) A violation of the civil False Claims Act (31 U.S.C. [§] 3729–3733)." FAR 52-203-13(b)(3)(i)(A)–(B). Invoking these provisions, AEG avers that the prospective contractor's use of the above-market SIHD Index in calculating its cost proposal, and in thereafter billing DLA Energy throughout the three-year life of the fuel supply contract, would expose AEG to criminal prosecution or civil enforcement measures and/or debarment proceedings under United States law.

Even assuming AEG's interpretation of the effect of the SIHD Index is accurate,[19] plaintiff's claims fail for a number of reasons. First, AEG's allegations do not genuinely implicate either FAR provision because AEG is not responsible for setting (or otherwise advocating for the adoption of) the fuel pricing index bidders must employ in calculating their cost proposals. After presumably negotiating this provision with Djiboutian government officials, DLA Energy is foisting the adjusted rates on all bidders. As such, the eventual awardee likely will either be required to pay above-market rates for the SIHD-supplied fuel and pass the increased costs on to DLA Energy, or realize increased profit margins, or some combination thereof over the life of the Djiboutian fuel contract. As the facts stand, these outcomes cannot reasonably be attributed to AEG. In preemptively reporting its concerns to DLA Energy, moreover, AEG has mitigated the deception required in any fraud prosecution or civil enforcement action.

Second, AEG fails to demonstrate why it is illegal for the United States to agree in advance to pay above-market rates for fuel in a foreign country. It is clearly within DLA Energy's discretion to establish the price of the solicitation, and it is well-documented that different countries pay wide ranging rates for their Djiboutian military base leases.[20] Relatedly, AEG's fraud allegations are just that–*allegations*–

---

[19] As noted *supra*, defendant asserts AEG misapprehends the import of the Economic Price Adjustment provision in the solicitation, claiming the SIHD Index values do not set the base price, but rather, serve as a reference point for later adjustments to deal with changes in the economy. Regardless of whether DLA Energy adopts or references such prices, this is within the agency's discretion for the reasons stated above.

[20] Kanako Masuda, *Competition of Foreign Military Bases and the Survival Strategies of Djibouti*, Knowledge Report No. 8, at 19, JICA Ogata Sadako Research Institute for Peace and Development (July 2023) (https://perma.cc/D63J-AQ69) (last visited Sept. 5, 2024).

18

and DLA Energy has nevertheless decided to proceed with the inclusion of the SIHD Index in the solicitation. Put simply, AEG has failed to demonstrate that the Economic Price Adjustment provision in the solicitation is arbitrary, capricious, an abuse of discretion, or contrary to law.[21]

### 2. *Irreparable Harm*

AEG argues the company will lose the ability to compete for the (re)award of the CLINs valued at over $500 million as well as the significant sunk costs spent developing the required business relationships and infrastructure in the region if the Court does not grant a preliminary injunction. While a lost opportunity to compete in a contract solicitation may establish the requisite harm, the likelihood the protester will succeed on the merits of the case impacts the level of harm they will experience. *Akal Sec., Inc. v. United States*, 87 Fed. Cl. 311, 319–20 (2009) ("[T]he strength or weakness of [movant's] merits arguments largely determines the court's view of irreparable injury. Because [protester] has not shown a reasonable likelihood of success on merits, the court concludes that the irreparable injury prong does not support injunctive relief."). While it is nearly certain AEG will lose the opportunity to win the pending DLA Energy fuel supply contract in Djibouti, the claimed harm is attenuated because AEG failed to show it was likely to be a successful awardee. Further, any reimbursement AEG receives from DLA Energy as a consequence of the recent termination for convenience of the predecessor contract will mitigate, in whole or in part, certain sunk costs.[22] While it is unclear whether AEG's investments can be redirected toward other fuel supply contracts in the region, any recent infrastructure expenses were a calculated business risk given AEG's and the company's designated in-country suppliers' continuing failure to secure the required PAL and SIHD supply commitment letter.

### 3. *Balance of Hardships*

The balance of hardships does not tip in AEG's favor. DLA Energy credibly represents that an injunction will require the agency to make additional spot buys or award another short-term bridge contract rather than reap the financial, continuity, and labor benefits (i.e., cost avoidance and cost savings) of a long-term award. The Court must also consider the compounded harm DLA Energy has endured over the

---

[21] AEG's claim that the Economic Price Adjustment provision creates a sole source procurement fares no better. First, AEG has not credibly argued that only UCIG has access to the SIHD Index to the exclusion of AEG's in-country suppliers. In fact, AEG's proffered calculations of the net effect suggest otherwise. But, even assuming so, notwithstanding AEG's longstanding responsibility concerns regarding UCIG, nothing in the current record prevents AEG or another bidder from partnering with UCIG as an in-country supplier. *See Impresa Construzioni*, 238 F.3d at 1335 ("[P]ast criminal activities by a corporate officer do not automatically establish that the bidder fails the responsibility requirement."). This provision also did not prevent NOC Djibouti or Rubis Djibouti from remitting their MOE arrearages and fixing their outstanding licensing issues to meet technical eligibility requirements.

[22] AEG reportedly submitted its termination settlement proposal to DLA Energy on July 17, 2024.

past eighteen months during the successive pre- and post-award bid protests lodged in the GAO and this Court by AEG and the company's competitors. Finally, where, as here, the movant cannot demonstrate a likelihood of success on the merits, an injunction causes greater harm to the non-movant. *See Team Waste Gulf Coast, LLC v. United States*, 135 Fed. Cl. 683, 693 (2018).

### 4. Public Interest

"[T]he public has a strong interest in a fair and competitive procurement process, which is best served by ensuring that the government complies with regulations governing procurement programs." *KWV, Inc. v. United States*, 111 Fed. Cl. 119, 128 (2013) (citations omitted). Again, however, AEG is unlikely to succeed on the merits of this pre-award bid protest. Enjoining DLA Energy from moving forward with the contract award is thus not in the public interest. *See FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993) ("Absent a showing that a movant is likely to succeed on the merits, we question whether the movant can ever be entitled to a preliminary injunction unless some extraordinary injury or strong public interest is also shown."). The sole potential extraordinary injury at issue in this case is the prospect of interrupted fuel supplies to the only United States military assets in Africa–potentially jeopardizing mission critical operations in the volatile region. Accordingly, the public interest weighs heavily in favor of denying injunctive relief.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for a preliminary injunction (ECF 4) is DENIED and defendant's cross-motion to dismiss (ECF 24) is DENIED. The parties shall file a joint status report on or before September 16, 2024, proposing a schedule of further proceedings in this case.

It is so ORDERED.

Armando O. Bonilla
Judge